# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARTIN D. M.,

                Plaintiff,

   v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

Case No. 22 C 5168

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Martin D. M. seeks to reverse the final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits and Supplemental Security Income. The Acting Commissioner moves for summary judgment affirming the decision. For the following reasons, the Court affirms the ALJ's decision.

## BACKGROUND

This is Martin's third trip to federal court on disability applications he filed over 11 years ago. Martin alleges disability since October 10, 2009 due to fibromyalgia, anxiety, depression, endocrine dysfunction, and heavy metal poisoning. Martin is currently 61 years old and was 46 years old on the alleged onset date. He has a high school education and previously work as an office helper and waiter.

The administrative law judge ("ALJ") issued the fourth written decision in this case on February 22, 2022, denying Martin's applications. (R. 1215-34). The ALJ concluded that fibromyalgia was a severe impairment but did not medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 1218, 1222-23. The ALJ found Martin's

hypogonadism, hypothyroidism, depression, anxiety, and heavy metal poisoning to be non-severe. *Id*. at 1218-22. Under the "Paragraph B" analysis, the ALJ found that Martin had mild limitations in the four functional areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*. at 1218-20. The ALJ then determined that Martin had the residual functional capacity ("RFC") to perform a reduced range of light work except that he: (1) can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (2) can never climb ladders, ropes, or scaffolds; (3) can never work around unprotected heights or unprotected dangerous moving machinery; (4) can perform simple, routine tasks as required for unskilled work that does not require a fast-production rate pace; (5) should have low stress work where changes in the work routine are infrequent; and (6) can have no more than incidental interaction with the public. *Id*. at 1223-33. Given this RFC, the ALJ concluded that Martin was not disabled because he is capable of performing his past relevant work as an officer helper. *Id*. at 1233-24.

## **DISCUSSION**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education,

and work experience. 20 C.F.R. § 404.1520(a)(4);[1] *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. ---, 139 S.Ct. 1148, 1154, (2019) (quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Martin seeks reversal and remand of the ALJ's decision, arguing that the ALJ improperly assessed his subjective symptoms and failed to support the RFC finding with substantial evidence. The Court disagrees and finds that substantial evidence supports the ALJ's subjective symptom and RFC assessment.

---

[1] Since the regulations governing DIB (20 C.F.R. § 404.1501 et seq.) and SSI (20 C.F.R. § 416.901 et seq.) are essentially the same, the Court cites only to the DIB regulations. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case.").

A.    **Subjective Symptom Assessment**

Martin contends that in assessing and discounting his symptoms, the ALJ "improperly relied on [his] activities of daily living, medical treatment, anxiety, and lack of acute distress." Doc. 11 at 11.  The ALJ found that Martin's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 1225).  Having reached this conclusion, Social Security Ruling 12-2p required the ALJ to consider all of the evidence in the record, including "the person's daily activities, medication or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012).  "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support.").

Martin has not shown that the ALJ's evaluation of his subjective fibromyalgia-related symptoms was patently wrong.  The ALJ explained that the evidence established some limitations but the record as a whole did not support the alleged loss of functioning. (R. 1225, 1230).  The ALJ reasonably found that the objective medical evidence, Martin's course of fibromyalgia treatment, and his daily activities were not reflective of disabling symptoms and limitations. *Id*. at 1230-31.  The ALJ noted that Martin treats his fibromyalgia with an internal medicine doctor, Dr. David Edelberg.  The ALJ further noted that Martin is treated with various medications including Norco, Tramadol, Flexeril, various dietary supplements, and testosterone shots for his chronic pain. *Id*.  The ALJ considered the fact that Martin's treatment with Dr. Edelberg has been limited to only

a few times or sometimes less per year. *Id*. at 1227, 1228. As the ALJ noted, Martin began treatment with Dr. Edelberg in 2010 and was seen about once a year up until late 2017 when he was then seen about 2 to 3 times a year in 2018, and about every 3 to 4 months since 2019 (i.e., three or four times a year). *Id*. at 1230. The ALJ wrote that Dr. Edelberg noted tender points on his very first visit with Martin in 2010 but they have not been noted on any exams since that date. *Id*. The ALJ described Martin's physical exams with Dr. Edelberg, as well as the physical exams at the consultative evaluations and the one visit with Dr. Raad Rashan, as "generally unremarkable," and Martin does not contest this characterization. *Id*.

Martin begins by objecting to the ALJ's reliance on the fact that he did not require more treatment beyond medication, such as physical or occupational therapy, imaging studies like x-rays, MRIs, or CTs, and emergency room visits or hospital admissions for pain evaluations, to discredit his subjective symptoms. In addition to detailing the type and frequency of treatment, the ALJ emphasized the fact that Martin never required any further treatment beyond medications prescribed by his internist to support an inference that Martin's symptoms were under reasonably good control with regular narcotics prescribed by Dr. Edelberg, which is inconsistent with disabling symptoms. (R. 1226-29); *Brown v. Saul*, 799 F. App'x 915, 919 (7th Cir. 2020) ("conditions that can be controlled with medication are not disabling."); *see also Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (affirming decision to discount statements about the severity of symptoms because "the record medical evidence established that those symptoms are largely controlled with proper medication and treatment"). Because it was proper for the ALJ to consider the effectiveness of treatment, the Court finds no error in the ALJ's decision to discount Martin's testimony because his fibromyalgia symptoms were largely controlled with medication.[2]

---

[2] In his reply brief, Martin appears to suggest that the ALJ improperly discredited him due to a lack of additional treatment without explaining why his difficulty finding treaters who accepted Medicaid was an

Citing *Murphy*, Martin maintains that his lack of change in medication treatment does not suggest that he could work full-time. *Murphy*, 759 F.3d at 819 ("Simply because one is characterized as "stable" or "improving" does not necessarily mean that she is capable of doing light work."). But an ALJ may consider the effectiveness of treatment and medication in evaluating the nature and severity of a claimant's subjective allegations. 20 C.F.R. § 404.1529(c)(iv), (v); SSR 12-2p, 2012 WL 3104869, at *5; *see also* SSR 16-3p, 2017 WL 5180304, at *8. "While [Martin] is correct that the relevant question is not whether he has improved, but whether he can sustain full time employment, improvement *is* a relevant factor that

---

insufficient excuse. Doc. 20 at 9. This argument concerning Martin's treatment is waived because Martin failed to raise it in his opening brief. *Martin v. Kijakazi*, 2022 WL 1681656, at *3 (7th Cir. 2022) (claimant "waived this argument by failing to raise it in his opening brief."); *Frazee v. Berryhill*, 733 F. App'x 831, 834 (7th Cir. 2018) (claimant "sought to add more arguments in her district-court reply brief, but that was too late to avoid waiver."). In any case, the argument is not supported by the authority Martin cites, Social Security Ruling 16-3p. As an initial matter, the treatment, other than medication, received for relief of pain or other symptoms is an appropriate consideration. *See, e.g.*, 20 C.F.R. § 404.1529(c)(3)(v); SSR 12-2p, 2012 WL 3104869, at *5; *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021) (affirming ALJ's subjective symptom assessment where record showed "little in the way of actual treatment"). Furthermore, SSR 16-3p provides that while an ALJ may consider that "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," an ALJ may not find "the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record . . . without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). As the ALJ noted, Dr. Edelberg did not prescribe any alternative treatment for pain, such as physical therapy, injections, or pain management. (R. 1228, 1230). And the ALJ did consider the reason for Martin's lack of additional treatment, noting that many of the medical records show that Martin reported "good" energy and his pain was reasonably controlled with prescribed medication. *Id.*; *see Deborah M.*, 994 F.3d at 790 (ALJ addressed reasons for not seeking surgery for spinal issues by highlighting that claimant "reported that she was doing well, denied having weakness, dizziness, shortness of breath, or chest pain and had normal muscle strength and tone") (internal quotations marks omitted); *see also Walter O. v. Kijakazi*, 2022 WL 2046269, at *3 (N.D. Ill. June 7, 2022) ("Moreover, the ALJ considered a possible explanation for Walter's gap in mental health treatment when he considered that Walter's mental health is stable with medication and periodic counseling."). Additionally, Martin has not identified any evidence of financial obstacles to obtaining medical treatment that the ALJ ignored. As for Medicaid coverage, the ALJ acknowledged that Martin testified that "he has Medicaid medical insurance but has difficulty finding a doctor to accept it." (R. 1224, 1261-62). Moreover, as the Commissioner points out, Martin also testified that he chose to treat with Dr. Edelberg, who did not accept any insurance, over primary care physician Dr. Rashan, who did accept his insurance, because Dr. Rashan was unwilling to continue prescribing his regular medications and suggested he see a specialist. *Id.* at 714, 747, 1261-62. Accordingly, the ALJ did not err in her statements regarding Martin's failure to pursue additional treatment options.

ALJs may consider." *Dante B. v. Kijakazi*, 2022 WL 3926050, at *9 (N.D. Ill. Aug. 31, 2022); *Murphy*, 759 F.3d at 819 ("The key is not whether one has improved (*although that is important*), but whether they have improved enough to meet the legal criteria of not being classified as disabled") (emphasis added).

Although improvement and stability in symptoms does not in and of itself indicate an ability to sustain full-time work, the ALJ here did not improperly equate improvement and stability of Martin's fibromyalgia with an ability to work full time. Instead, the ALJ cited evidence of Martin's improved condition with just medications as evidence that undercut his own subjective testimony that his symptoms were disabling. The record did not just show improvement and stability, it showed improvement to the point that Martin's treating physician indicated that his "chronic pain from fibromyalgia [was] under reasonable control with [his] current regime." (R. 1714). The ALJ appropriately determined that the objective evidence of improvement and stability with medications suggested that Martin was not as limited as he claimed. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). Moreover, the ALJ cited to much more than just improvement and stability with medication. The ALJ mentioned numerous normal objective findings on physical exams which support her analysis. As a result, the ALJ did not err in considering the objective evidence of improvement and stability on medications in addition to the other evidence in the record when assessing whether Martin's subjective symptoms were as severe as he claimed.

The ALJ's conclusion that the record documents reasonably effective control of Martin's fibromyalgia symptoms is supported by substantial evidence. The ALJ noted that on March 3, 2010, Dr. Edelberg indicated that Martin had 18 out of 18 trigger points that were "very painful" to 4.4 kilograms of fingertip pressure. (R. 1225). Dr. Edelberg planned to treat Martin with

medications. *Id*. Martin next saw Dr. Edelberg a month later in April 2010 and reported being unable to tolerate Savella and being too agitated with Nuvigil. *Id*. The ALJ noted there was no further appointments with Dr. Edelberg or any other medical evidence until two years later. *Id*. In April 2012, Martin reported to Dr. Edelberg that he was experiencing constant flare-ups. *Id*. A January 2013 physical consultative exam was normal except mild, vague tenderness in the neck without any paraspinal muscle spasms and mild tenderness in the back without any deformities or paraspinal muscles spasms. *Id*. at 1225-26. There was no trigger point tenderness. *Id*. at 1226. At an April 2013 physical consultative examination, Martin reported that his trigger points had improved and he felt generalized fatigue but exercising helped with his symptoms. *Id*. at 1226. On examination, Martin had normal findings and no positive trigger points were identified. *Id*.

The ALJ recognized that Martin reported in June 2013 that his energy was "extremely poor" and he was only performing at 25 percent of his usual activity, but he had full range of motion of the extremities and he was neurologically intact. (R. 1226). It was also noted that Martin had some difficulty getting his prescriptions filled at that time. *Id*. At his next appointment with Dr. Edelberg more than year later, Martin reported fatigue, muscle pain, erratic sleep, and brain fog. *Id*. His muscles were tense but there were no tender points, he had full range of motion of the extremities, and he was neurologically intact. *Id*. The ALJ further noted that in September 2015, Martin reported to Dr. Edelberg that his fibromyalgia symptoms were helped by excellent nutrition and regular exercise and his same medications were continued. *Id*. at 1044, 1226. The ALJ observed that in January 2016, Martin reported having "very severe" pain but stated he felt his Norco, Tramadol, Flexeril, and Zolpidem medications were controlling the pain. *Id*. at 1050, 1226. As the ALJ also pointed out, in April and October 2017, Martin reported to Dr. Edelberg that his pain was under "reasonably good control" with Norco, and Dr. Edelberg suggested medical

marijuana and Cyclobenzaprine as additional treatment. *Id*. at 1056, 1062, 1227. In October 2017, Martin confirmed that marijuana improved his sleep. *Id*. at 1062, 1227. In March 2018, Martin reported that his "pain [was] actually under reasonably good control." *Id*. at 1722.

At the April 18, 2018 hearing, Martin testified that his regular narcotic pain medication relieved his pain "pretty good" and he had been taking the same dose since 1993. (R. 716-20). Next, in September 2018, Martin told Dr. Edelberg that he had some stress-related worsening of pain but continued to get "reasonable relief" from his Norco medication and his energy was good. *Id*. at 1713. Dr. Edelberg wrote that Martin's chronic pain from fibromyalgia was "under reasonable control with current regime," but he does better on hormone replacement so he recommended continuing with that. *Id*. at 1227, 1714. In March 2019, Martin again reported some stress-related worsening of pain but also stated he continued to get reasonable relief from Norco or Tramadol and his energy was good. *Id*. at 1711. As the ALJ noted, in December 2020 and March 2021, Martin reported his fibromyalgia pain was under "reasonably good control" and his energy was good. *Id*. at 1227, 1697, 1862. Finally, the ALJ noted that on December 1, 2021, Martin reported that his pain had not been well controlled in recent months and he required readjustment of his medications in order to keep him functional. *Id*. at 1227, 1865. In addition, he reported that he continued to need help with his activities of daily living. *Id*. However, the ALJ noted that at the most recent hearing in February 2022, Martin testified that he lived in an apartment alone and he does not receive any assistance with activities of daily living from his sister. *Id*. at 1227, 1321, 1329. Given this discussion, the Court finds the ALJ adequately considered Martin's improvement and stability on medication alongside other evidence and supported her determination that Martin's symptoms were reasonably controlled with medication with substantial evidence.

Martin next objects to the ALJ's remark that "[t]here are labs in the file but no imaging studies such as x-rays, MRIs, or CTs." (R. 1230). Martin argues that the ALJ's reliance on lack of MRIs, x-rays, or CT scans shows a lack of understanding of fibromyalgia. The Seventh Circuit has cautioned "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("it is difficult to determine the severity of [fibromyalgia] because of the unavailability of objective clinical tests."). However, more recently, the Seventh Circuit issued an unpublished decision clarifying that the "Social Security Administration's guidance on evaluating fibromyalgia, SSR 12-2P, limits only the evidence used to *diagnose* the disease as a medically determinable impairment" but "does not limit the evidence an ALJ can consider in evaluating the *severity* of fibromyalgia for purposes of determining a[n RFC]." *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (emphasis in original) (citing 20 C.F.R. § 404.1529(c)(2) ("[E]vidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms.")). The *Gebauer* claimant had complained that the ALJ improperly evaluated the severity of her fibromyalgia by "citing evidence that was 'disconnected' from fibromyalgia itself." *Id*. The Seventh Circuit affirmed, noting that the ALJ properly evaluated the severity of the claimant's fibromyalgia due to the lack of "significant sensation loss, significantly reduced joint motion, muscle spasms, muscle atrophy, motor weakness," or other symptoms "associated with the pain that would prevent her from performing sedentary work." *Id*. (citing 20 C.F.R. § 404.1529(c)(1), (3)).

10

Thus, although an ALJ may rely in part on the lack of certain objective findings in fibromyalgia cases to discount a claimant's allegations, it does not appear that a lack of imaging studies is an indicator of the severity of fibromyalgia symptoms.[3] Because the ALJ did not explain the relationship between the subject imaging and the severity of Martin's subjective complaints, the Court concludes that the ALJ erred by partially discounting Martin's subjective allegations based on the lack of imaging studies. Nevertheless, the ALJ's reliance on this reason is not reversible error. The ALJ properly supported her subjective symptom finding with a longitudinal review of the record and pointed to substantial evidence that Martin did not experience disabling fibromyalgia symptoms. When discussing Martin's fibromyalgia, the ALJ noted: (1) 18/18 trigger points that were very painful on March 3, 2010; (2) generally unremarkable consultative exam findings in January 2013 and April 2013; (3) muscles were tense but there were no tender points on August 6, 2014; and (4) all normal exam findings noted except slight anterior head carriage in February, 2020, July 2020, May 2021, and December 2021 (R.1225-27). The ALJ then found that no further limitations were warranted because Martin's physical exams were generally unremarkable, lack of tender points on examination after his initial exam, pain reasonably

---

[3] The Commissioner argues that the ALJ was not stating that Martin had to obtain imaging to prove the severity of his symptoms, but rather, her point was that Martin continued taking the same medication for years without exploring additional workup for possible conditions other than fibromyalgia. However, the ALJ did not mention imaging studies for possible conditions other than fibromyalgia, and the Commissioner may not defend the ALJ's ruling with evidence the ALJ did not rely on. *Lothridge v. Saul*, 984 F.3d 1227, 1234-35 (7th Cir. 2021); *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) ("Our review is limited also to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different ground to stand upon."). SSR 12-2p provides guidance on how the agency develops evidence to establish a person has a medically determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *1. An ALJ may find that a person has a medically determinable impairment of fibromyalgia if, among other findings, there is evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *3. Thus, it is common in cases involving fibromyalgia to find evidence of examinations and testing, including imaging and laboratory tests, that rule out other disorders that could account for the person's symptoms and signs. *Id.* Here, the ALJ found that Martin's fibromyalgia was a severe impairment and did not state that other disorders that could cause Martin's symptoms were not excluded. Thus, the Commissioner's post-hoc rationale is not reasonable or supported by the record.

controlled with prescribed medication, the less generous opinions of the state agency consulting physicians, and Martin's daily activities. *Apke v. Saul*, 817 F. App'x 252, 257 (7th Cir. 2020) (when evaluating the severity of fibromyalgia symptoms, ALJs will look to the "claimant's reported activity levels and treatment received."); SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 201) ("When a person alleges [fibromyalgia], longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment."). Ultimately, the ALJ's subjective symptom determination was grounded on far more than a lack of imaging studies and there was no reversible error. *Manley v. Barnhart*, 154 F. App'x 532, 536 (7th Cir. 2005) ("the severity of [fibromyalgia] varies, and the claimant's subjective complaints need not be accepted insofar as they clash with *other evidence* in the record.") (emphasis added).

With respect to the ALJ's reference to a lack of emergency department visits or admissions for pain as a basis for discounting the seriousness of Martin's allegations, the Commissioner broadly defends the ALJ's analysis, claiming that Martin "had the burden to prove his symptoms were as bad as he claims, and his demonstrated contentment with taking the same medications for years without exploring different treatment . . . simply did not substantiate his allegations of crippling symptoms." Doc. 17 at 6. Although an ALJ may consider a failure to seek alternative treatment in discounting a claimant's symptomology, the lack of emergency room treatment is not a compelling reason to discredit an indigent claimant's subjective symptom testimony. *See Goins v. Colvin*, 764 F.3d 677, 679–80 (7th Cir. 2014) (criticizing as "unsound" the dismissal of claimant's testimony where ALJ "noted she had no health insurance, but thought that at least she might have been expected to visit a hospital emergency room more frequently than she had done"); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (finding error where ALJ "noted [the

plaintiff's] explanation that she hadn't had medical insurance or an income large enough to pay for medical treatment out of pocket, but said she could have sought treatment in a hospital emergency room . . . [and] seemed unaware that emergency rooms charge for their services and are required to treat an indigent only if the indigent is experiencing a medical emergency").  In this case, Martin is a Medicaid recipient, and the ALJ likely improperly considered a failure to pursue emergency room care for pain to cast doubt on Martin's claim of disabling symptoms.  However, this error is harmless because the ALJ relied on multiple supported grounds for discounting Martin's subjective statements, including essentially normal functioning at every appointment of record, reasonable control of his symptoms with medications, and daily activities that were inconsistent with the extreme nature of his complaints. *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are . . ., and here the ALJ cited other sound reasons for disbelieving [claimant].").

The ALJ also reasonably considered Martin's daily activities in assessing the intensity and persistence of his symptoms. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (daily activities is a factor that "may be used to discredit a claimant's testimony").  Martin claims that the ALJ failed to identify any specific activities or discuss how they were performed.  But at step two, the ALJ explained that Martin's ability to supervise his minor nephew, drive, read, watch television, vacuum, take care of a dog, perform personal care, prepare simple meals, do laundry, shop in stores and by computer, email, text, count change, draft lengthy typewritten narratives about his symptoms and limitations, attend appointments with no mention of social difficulties, and never having been fired or laid off from a job because of problems getting along with others indicated that he was no more than mild limited in the four broad categories of mental functioning. (R. 1218-20).  The ALJ observed that Martin stated he prefers to communicate by text, email, and

internet postings. *Id*. at 1219. The ALJ further noted Martin's testimony that he receives no physical help with daily activities and that they just go undone until he can perform them. *Id*. at 1220, 1224. In the RFC discussion, the ALJ noted that Martin's ability to go to restaurants with his nephew, grocery shop, exercise at a gym, and maintain contact with some friends undermined his allegation that his anxiety prevents him from appropriately interacting with others. *Id*. at 1232. The ALJ again mentioned Martin's daily activities of taking care of his nephew a couple of times a week when he lived in his sister's home until September 2020, his ability to live alone in an apartment complex since then, his ability to drive for 40 minutes to his gym where he exercises twice weekly, and taking care of his sister's dog when she travels. *Id*. at 1224, 1230. The ALJ considered Martin's testimony that his apartment "is a complete wreck" because he is unable to clean due to his fibromyalgia pain but noted that Martin then testified to vacuuming ten days prior. *Id*. at 1224. Based on these findings, Martin's argument that the ALJ failed to sufficiently identify specific activities or how they were performed is a non-starter. Moreover, the Court finds that it can follow the ALJ's reasoning and therefore the ALJ built an accurate and logical bridge between the range of Martin's daily activities and her conclusion that Martin was not as limited as he claimed. *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013) (ALJ need only minimally articulate his reasons for his adverse credibility determination).

Another argument Martin makes is that the ALJ failed to appreciate that he performed his daily activities at "his own pace with unlimited flexibility without having to meet workplace standards." Doc. 11 at 12 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (explaining that "[t]he failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.")). It is true that "[a]n ALJ may not equate activities of daily living with those of a full-time job[,] [b]ut an ALJ is not forbidden

from considering statements about a claimant's daily life." *Jeske*, 955 F.3d at 592. Contrary to Martin's argument, the ALJ did not impermissibly equate his activities of daily living with an ability to perform full-time work. Rather, the ALJ explicitly recognized that Martin's "described activities are not conclusive proof that claimant can perform full-time work and that such activities are just one factor to be considered by the administrative law judge in evaluating subjective complaints and symptoms and assessing the residual functional capacity." (R. 1232-33). Thus, the ALJ permissibly found that Martin's admitted activities of daily living were not entirely consistent with his reports of being unable to appropriately interact with others and disabling pain and fatigue. *Id*. at 592-93; *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The ALJ did not equate [the claimant's] ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limited effects of her symptoms . . . .").

Next, relying on *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019), Martin contends that the ALJ erred in using his mental state at medical appointments to receive treatment for his fibromyalgia to determine how he would perform during a full-time job. In *Crump*, the ALJ improperly discounted the claimant's treating psychiatrist's opinion about her inability to concentrate specifically in a work setting (rather than in an examination). *Id*. at 569, 570. Because the psychiatrist's work-related assessment directly addressed the claimant's inability to concentrate reliably in the workplace, the psychiatrist's finding that the claimant could pay attention in the doctor's office did not save the ALJ's RFC formulation which did not account for the claimant's CPP limitations. The Seventh Circuit stated that the ability to "pay attention in the doctor's office and thus in the context of a structured, relatively short mental health examination"

was "an altogether different environment than a full day at a competitive workplace with sustained demands." *Id*. at 571.

Martin alleged debilitating anxiety particularly with interactions with others in a work setting, but the ALJ concluded that his account was not fully consistent with the lack of documentation of any difficulty at medical visits, testimony that he went to restaurants with his nephew, grocery shopped, worked out at a gym, and has some friends that he has contact with. (R. 1232). In contrast to *Crump*, Martin does not identify evidence other than his own testimony that suggested an inability to interact with others in the workplace. *Id*. at 1277-1285. None of the state agency physicians or psychologists opined that social interaction limitations were necessary. Indeed, only Dr. Edelberg—who opinion the ALJ permissible rejected—opined generally that anxiety affected Martin's physical condition, but he did not opine that Martin could not interact with others in the workplace. *Id*. at 1760-66.[4] *Crump* does not hold that an ALJ may never consider a claimant's presentation at medical visits when evaluating his social functioning allegations. Moreover, Martin's argument that the ALJ failed to mention that Dr. Herman Langer, M.D., noted that Martin's affect was anxious at a psychiatric consultative evaluation where he was in an unfamiliar environment is simply incorrect. The ALJ expressly acknowledged that "[u]pon mental status evaluation, [Martin's] affect was anxious" at Dr. Langer's evaluation. *Id*. at 1221. Thus, the ALJ properly discussed Martin's demonstrated ability to tolerate interacting with others and normal presentation during appointments as indicating that his allegations of anxiety with social interactions were not as limiting as he alleged. *Id*. at 1219, 1232.

Regarding Martin's memory, focus, and ability to express himself, the ALJ relied in part on Martin's many pages of typewritten narratives in the record, which demonstrated "he is very

---

[4] Martin does not challenge the ALJ's weighing of Dr. Edelberg's March 2021 opinion or any other opinion evidence in the record.

well able to express himself and bring memory and focus to bear to provide a coherent, albeit perseverative narrative about his symptoms and limitations." (R. 1232); *see also id.* at 1219.  The ALJ explained that Martin's typewritten lengthy narrative are "coherent, detailed, and specific with full sentences with appropriate grammar and punctuation." *Id.* at 1232.  She concluded that these forms "do not indicate that [Martin] has any difficulty expressing himself, or with memory for details which are either short-term or long-term." *Id.*  Martin argues when considering his typewritten narratives, the ALJ did not properly consider how that activity was performed as a result of his limitations.  In his brief, Martin faults the ALJ for not considering "how long these [narratives] took to compose, what if any help he received or how much stress the process caused him." Doc. 11 at 14.

It is correct that when assessing a claimant's alleged symptoms, an ALJ may not ignore "qualifications as to *how* he carried out those activities." *Craft*, 539 F.3d at 680 (emphasis in original).  But here, Martin does not cite to any evidence of record to support qualifications with regard to his narrative writing or that contradicts the ALJ's findings. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability.").  Thus, Martin's position appears based on speculation with no support in the record. *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence.").  Likewise, Martin's argument that his recall for his psychiatric issues "may" have been a symptom of his condition is speculation. Doc. 11 at 15.  That speculation is insufficient to show that the ALJ committed reversible error in assessing his subjective symptoms.  Contrary to Martin's argument otherwise, the ALJ also did not improperly equate Martin's ability to recall these personal experiences in lengthy writings with an ability to work.  Instead, she merely used Martin's writing activity as one factor to assess the

credibility of his statements concerning the intensity, persistence, or limiting effects of his symptoms on his memory, focus, and ability to express himself. *Burmester*, 920 F.3d at 510. The Court therefore finds no error in this regard.

Finally, Martin contends that the ALJ drew an improper inference from notations that he was in no "acute distress" at many appointments. Martin argues that the ALJ did not explain how findings of "no acute distress" are inconsistent with his symptom testimony. Martin says "no acute distress" is irrelevant to the symptom evaluation because it merely means that he would "probably not become unstable in the next 5 minutes." Doc. 11 at 15 (citing *Wanserski v. Colvin*, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015)). However, "a significant number of [] courts have ruled that a finding of 'no acute distress' is a relevant factor for an ALJ to consider in a symptom evaluation, especially when accompanied by other findings." *John J. v. Kijakazi*, 2021 WL 3910750, at *5 (N.D. Ill. Sept. 1, 2021) (noting that the "Seventh Circuit has upheld an ALJ's decision in which the ALJ relied on examination notes that a claimant was in no acute distress along with other evidence to evaluate the severity of a claimant's symptoms."); *see also Gebauer*, 801 F. App'x at 410 (holding that in evaluating the severity of fibromyalgia, the ALJ properly "considered the evidence of [claimant's] daily activities in balance with the rest of her record, including evidence that her doctors noted 'no apparent physical distress,' even on the days when she complained of pain, a lack of evidence that she had 'significant sensation loss, significantly reduced joint motion, muscle spasms, muscle atrophy, motor weakness,' or other symptoms 'associated with the pain that would prevent her from performing sedentary work.'").

In her decision, the ALJ stated that "[e]xaminations of record since the alleged onset date have indicated [Martin] being in no acute distress." (R. 1231). The ALJ did not solely rely on medical providers' notations that Martin was not in "acute distress" but mentioned this evidence

alongside other evidence, such as normal findings during examinations even when complaining of extreme fatigue and pain. *Id.* at 1226, 1227; *Kurt A. v. Kijakazi*, 2023 WL 2663757, at *3 (N.D. Ill. March 28, 2023) ("Because the ALJ did not rely exclusively on the 'no acute distress' notations as the basis for her symptom evaluation, her inclusion of them is not error."); *Wolvin v. Kijakazi*, 2023 WL 371638, at *3 (E.D. Wis. Jan. 24, 2023) ("But what is most material is that medical professionals often noted that Wolvin did not appear to be in "acute distress" at times when Wolvin was subjectively reporting severe pain. This juxtaposition is relevant to an assessment of the severity of Wolvin's symptoms under SSR 16-3p and supports an inference that he may be exaggerating his symptoms"). Since the ALJ cited other reasons for discounting Martin's complaints of disabling pain and symptoms, including largely unremarkable physical exams, generally effective medications for treating his symptoms, the assessed RFC limitations were more generous than the opinions of the state agency consultants, and his daily activities, the ALJ did not err in relying upon findings that Martin was in "no acute distress" at appointments. (R. 1230).

In sum and for all these reasons, the ALJ's adverse subjective symptom finding was not perfect, but it was also not patently wrong.

## B. RFC Determination

Martin asserts that the non-exertional limitations in the RFC inadequately account for his stress and anxiety symptoms, fatigue, and drowsiness from medication. Martin also challenges the RFC finding as to his lifting ability. RFC is the "maximum work that someone seeking benefits can sustain doing in light of their impairments." *Poole v. Kijakazi*, 28 F.4th 792, 794 (7th Cir. 2022). In reaching her RFC assessment, the ALJ must "articulate at some minimal level her analysis of the evidence." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Ultimately, an

ALJ need only include limitations in the RFC that are supported by the medical record. *Deborah M.*, 994 F.3d at 791.

### 1.      Stress and Anxiety

On September 2, 2021, the Appeals Council issued a remand order for resolution of one issue. (R. 1424-25).  The Appeal Council directed the ALJ to "further evaluate how stress affects [Martin's] symptoms, and to explain how the RFC mitigates his stress-related symptoms." *Id*. at 1425.  The Appeals Council noted Dr. Edelberg's August 24, 2014 statement that "[r]eduction of stress is integral to any improvement in [Martin's] symptoms." *Id*. at 656, 1424.  At the February 2, 2022 hearing, Martin testified that when he is feeling anxious and stressed, his fibromyalgia pain increases.  Martin further testified that in a work setting, he feared not meeting expectations, feeling shame and humiliation from not being able to articulate properly, being mocked, and being unable to interact appropriately with others.  He testified that this fear increased his anxiety. *Id*. at 1322-30.  The ALJ noted Martin alleged that when his fibromyalgia pain increases, it causes lack of sleep which in turn causes him to suffer "unbearable" pain. *Id*. at 1224, 1323.  The ALJ explained that Martin alleged that when he has "unbearable" pain, a whole day can go by without him accomplishing anything. *Id*.

The ALJ found that despite the impact of stress, Martin is able to engage in many activities, communicate effectively with his care providers and others, participate in his own care and medical treatment, and live independently. (R. 1232).  The ALJ then accommodated Martin's issues with anxiety, stress, and engaging with others by reducing his work to simple, routine tasks as required for unskilled work that does not required a fast-production rate pace, and low stress work where changes in work routine are infrequent. *Id*. at 1223, 1224, 1232-33.  Moreover, the ALJ explained that since interaction with the public on an intensive and ongoing basis may be considered stressful

and could exacerbate his symptoms, she included a limitation to no more than incidental interaction with the public. *Id*. at 1233. She found that no further RFC limitations were warranted by the record. *Id*.

Martin claims the ALJ did not explain how the RFC's non-exertional limitations account for his "debilitating stress caused by the chance of committing an error or thought of being criticized by coworkers or supervisors." Doc. 11 at 6. The ALJ considered Martin's testimony regarding his anxiety and fear about a work environment but did not find his allegation of debilitating stress fully credible. (R. 1220-21, 1231-1233). Contrary to Martin's assertions, the ALJ provided a number of well-supported reasons to explain her finding that Martin's stress and anxiety-related symptoms were not as severe as alleged. For example, the ALJ noted that Martin has not been treated by a psychiatrist in the past year and that his anxiety treatment is medication prescribed by Dr. Edelberg to help him sleep and medication during the day as needed. *Id*. at 1221, 1231. The ALJ further noted Martin has not sought counseling. *Id*. at 1231. Thus, the ALJ concluded that Martin had received no treatment for mental health symptoms other than medication through his primary care provider, which was not entirely consistent with debilitating mental symptoms. *Id*.[5] Additionally, the ALJ pointed out that: (1) in January 2016, Martin reported to Dr. Edelberg that his anxiety with panic was controlled with Clonazepam 1 milligram; (2) in April and October 2017 and September 2018, Martin reported to Dr. Edelberg that his mood was positive; (3) during an August 21, 2019, emergency department examination, Martin denied anxiety or depression on exam and he was not agitated, not uncooperative, and not combative; and (4) in February, July, and December 2020 as well as May and December 2021, on examination,

---

[5] Martin suggests for the first time in his reply brief that the ALJ violated SSR 16-3p by failing to consider and address possible reasons why he did not pursue further mental health treatment. Doc. 20 at 3. This argument is waived. *Martin*, 2022 WL 1681656, at *3; *Frazee v. Berryhill*, 733 F. App'x at 834.

Martin was alert, oriented times three, had intact memory, and normal mood and affect. *Id*. at 1221, 1229, 1232.

Moreover, the ALJ did not accept Martin's testimony that he has severe anxiety when he has to interact with others because during the last few years when seen a couple of times a year (or before than annually) by Dr. Edelberg, Martin was not noted on examination to have difficulty with attention, focus, memory, understanding, or communication. (R. 1231). In addition, the ALJ explained that she gave some weight to the opinions of the state agency psychologists who found that Martin's anxiety-related disorder was non-severe and did not assess any mental functional limitations. *Id*. at 1221-22. Finally, the ALJ took into account the fairly unremarkable consultative exam findings on mental status evaluations, which suggest that his symptoms were not as severe as alleged. *Id*. at 1221. These are valid reasons for which the ALJ discounted Martin's allegation of debilitating stress and anxiety.[6]

Martin further faults the ALJ for not providing an RFC limitation on interaction with coworkers and supervisors, but the ALJ did not find such a limitation supported by the record. Martin attempts to rebut the ALJ's conclusion with his own subjective statements, pointing out that he stated that his anxiety stemmed from interaction with authority figures, fear of not being able to meet expectations, inability to articulate things properly, and possibility of being mocked. However, the ALJ reviewed this evidence and concluded otherwise. The ALJ considered the adult

---

[6] Martin also claims the ALJ demonstrated a lack of understanding of his testimony that "his fibromyalgia pain increased from anxiety and became unbearable making him unable to function, not that his fibromyalgia caused anxiety." Doc. 11 at 5. This argument is unpersuasive. The ALJ recognized Martin's testimony that "for over 20 years his anxiety has had an effect on his fibromyalgia." (R. 1220). The ALJ also noted that Martin testified that "when he has anxiety from stress, it causes his fibromyalgia pain and brain fog to exacerbate." *Id*. at 1224. Finally, the ALJ considered Martin's allegation that "anxiety causes mental and physical symptoms to the point where he is entirely debilitated and in 'a vegetative state.'" *Id*. at 1232.

function reports submitted by Martin, where he alleged that authority figures have always "produced a bit of anxiety," he could have a "near panic attack from simple instructions" when his fibromyalgia flares up, and that he is intimidated by authority figures "to the point of freezing up or complete avoidance." (R. 327, 338, 375, 1219). The ALJ also considered Martin's hearing testimony endorsing anxiety, particularly with interactions with others. *Id*. at 1220-22, 1231-32. In particular, the ALJ considered Martin's testimony that anxiety causes him mental and physical symptoms to the point that he is entirely debilitated and in a "vegetative state." *Id*. at 1232, 1328-29. The ALJ further considered the third-party function reports submitted by Martin's sister, which denied any problem getting along with others, including authority figures, but noted he is limited in carrying on a conversation due to brain fog. *Id*. at 311-12, 386-87, 1229. Martin ignores this record, and the Court declines to reweigh the evidence or substitute its judgment for the ALJ's. *Reynolds*, 25 F.4th at 473.

Contrary to Martin's argument that the ALJ provided no explanation as to why interaction with coworkers and supervisors would not induce stress, the ALJ's decision shows that she sufficiently considered evidence regarding Martin's alleged inability to interact appropriately with others and rejected such evidence. (R. 1232). For example, at step two, the ALJ explicitly considered Martin's testimony that he has a general distrust of doctors and when he is unable to express himself during a social interaction, he becomes uncomfortable. *Id*. at 1219. The ALJ found that Martin had only mild limitation in interacting with others. *Id*. The ALJ observed that Martin reported being able to shop in stores, go to the gym, and attend appointments with no mention of social issues. *Id*. The ALJ noted that the medical record failed to document difficulties interacting with medical personnel or unusual, inappropriate, aggressive, avoidant, or otherwise noteworthy interactions. *Id*. The ALJ also noted that Martin was consistently described as pleasant and

cooperative with regard to his ability to interact with others. *Id*.[7]  In her RFC decision, the ALJ found that the "record does not support that [Martin] is unable to interact with the public, family members or treating physicians." *Id*. at 1232.  The ALJ added that Martin testified he has some friends that he has contact with. *Id*.  Finally, the ALJ discounted Martin's testimony about struggling to interact with others in light of an August 2019 emergency room note which did not document any difficulty interacting with the unfamiliar personnel or the environment with other patients. *Id*.  From these discussions, it is clear the ALJ did not find a supervisor or coworker limitation to be warranted.  Furthermore, no doctor opined that Martin had any coworker or supervisor interaction limitations. *Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) (a "fundamental problem is [claimant] offered no opinion from any doctor to set sitting limits . . . greater than those the ALJ set"); *Best v. Berryhill*, 730 F. App'x 380,382 (7th Cir. 2018) (finding no error where "no doctor recommended any limitations based on [claimant's radiculopathy] condition").  Nor does Martin argue that the ALJ erred in partially crediting the opinions of the state agency psychologists, who both assessed only a mild restriction in social functioning and found Martin's anxiety-related disorders non-severe. (R. 133-34, 140-41, 149, 158, 1221-22). Accordingly, the ALJ did not commit reversible error in assessing Martin's anxiety and stress, and more than a mere scintilla of evidence supports the ALJ's decision.

### 2.    Fatigue

Martin next argues that the RFC did not account for his limitations associated with fatigue. Here, the ALJ adequately considered Martin's fatigue and concluded that Martin's reported fatigue symptoms was not as severe as he alleged.  For instance, the ALJ noted that Martin stated that completing tasks was an issue for him because he fatigues easily and loses focus. (R. 338, 1219).

---

[7] Martin does not challenge the ALJ's step 2 finding that his anxiety with panic disorder was a non-severe impairment.

The ALJ considered the fact that Martin reported at his April 2013 physical consultative examination that exercising helps his generalized fatigue symptoms. *Id*. at 570, 1226. The ALJ noted that on June 4, 2013, Martin reported to Dr. Edelberg that his energy was "extremely poor" and that he was only "performing at 25 percent of [his] usual activity." *Id*. at 1032, 1226. The ALJ further noted that Dr. Edelberg wrote that Martin was having some difficulty getting his prescriptions filled at that time. *Id*. at 1033, 1026. The ALJ noted that in August 6, 2014 and September 2015, Martin reported to Dr. Edelberg that he was having fatigue. *Id*. at 1038, 1044, 1226. The ALJ also pointed out that Martin reported that his fibromyalgia symptoms were helped by excellent nutrition and regular exercise along with medications. *Id*. at 1226. He had normal examination findings at those appointments other than tense muscles. *Id*. In addition, the ALJ noted that in October 2017, Martin reported that marijuana improved his sleep. *Id*. at 1062, 1227. In September 2018 and March 2019, Martin reported his energy was good with respect to his hypothyroidism. *Id*. at 1711, 1713. The ALJ noted that in May 2021, Martin reported that his fibromyalgia pain was under reasonably good control but he did not have the stamina to work a full shift. *Id*. at 1227, 1862. With respect to his hypothyroidism, Martin reported that his "energy is good." *Id*. at 1862. The ALJ noted that in December 2021, Martin reported that he was not able to be employed and continued to need help with activities of daily living because of his fibromyalgia pain and fatigue. *Id*. at 1227, 1865.[8] Dr. Edelberg wrote that Martin's energy was

---

[8] Martin points out that the ALJ incorrectly stated that Martin also reported to Dr. Edelberg on December 2, 2021 that his energy was good, when, in fact, Martin report at his prior appointment on May 25, 2021 that his energy was good with respect to his hypothyroidism. Doc. 11 at 8; (R. 1865). The ALJ nevertheless expressly recognized that Martin reported that was not able to be employed and he continued to need help with activities of daily living due to pain and fatigue. (R. 1227). Martin has not shown that remand is necessary for the ALJ to correct this single discrepancy with regard to Dr. Edelberg's December 2, 2021 progress note. Moreover, Dr. Edelberg did not, as Martin claims, opine that Martin did not have the stamina for working a full shift. Rather, the May 25, 2021 note documented Martin's subjective complaint that he did not have the stamina to work a full shift as opposed to Dr. Edelberg's opinion. *Id*. at 1865.

helped by twice weekly testosterone injections and anastrozole. *Id*. at 1865. However, the ALJ correctly noted that the record reflected that approximately one month later, Martin testified at the most recent hearing that he was not receiving any assistance with activities of daily living and was living alone in an apartment. *Id*. at 1227, 1319, 1321.

In addition, in assessing Martin's fatigue complaints, the ALJ considered Martin's daily activities such as taking care of his nephew twice a week, being able to live alone without physical help, and being able to drive for 40 minutes to exercise at a gym twice a week. (R. 1224). Further, as the ALJ observed, the RFC finding was more generous than the opinions of the state agency consulting physicians who did not find any physical functional limitations. *Id*. at 1230; *Burmester*, 920 F.3d at 510 (RFC finding that is "more limiting than that of any state agency doctor or psychologist, illustrat[es] reasoned consideration given to the evidence [claimant] presented."). Finally, Martin cites Dr. Edelberg's March 2021 opinion as support for his claim that he could not work an eight hour shift without resting the following day Doc. 11 at 7, 9. But the gave only limited weight to Dr. Edelberg's opinion, and Martin does not challenge this finding. (R. 1228-29). In light of this record, substantial evidence supports the ALJ's conclusion that Martin's fatigue was not as severe as alleged. As such, the ALJ did not need to include an additional limitation in her RFC and remand is not warranted on this basis. *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) (ALJ need only include limitation in her RFC determination that are "supported by the medical evidence and the ALJ [finds] to be credible.").

### 3. Drowsiness

Martin also argues that the ALJ failed to properly accommodate his drowsiness from his medications. Martin points to his statements that heavy narcotic use helped with his functioning but caused extreme drowsiness and that his medication side effects caused him to take most of the

day to get moving. Doc. 11 at 10; (R. 369, 738-39). Martin further cites Dr. Edelberg's opinion in March 2021 which indicated that Clonazepam and Cyclobenzaprine induce sleep. (R. 1760).

The ALJ properly considered Martin's medication side effects when evaluating his ability to work. *Flores v. Massanari*, 19 F. App'x 393, 399 (7th Cir. 2001) ("The side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process."). The ALJ acknowledged that Martin reported that Hydrocodone and Clonazepam caused him drowsiness. (R. 1230). However, the ALJ fairly found that Martin's medication side effect symptoms were not as severe and limiting as he alleged because the medical record did not show that he reported significant side-effects from his prescribed medications. *Id*. at 1234. Nonetheless, the ALJ explicitly explained that Martin's potential drowsiness contributed to her RFC finding that he had limitations on heights, hazards, and climbing and that at most, he can perform simple routine tasks as required for unskilled work that does not require fast-production rate pace. *Id*. at 1230. Moreover, the state agency physicians and psychologists considered that Martin was treating his symptoms with tramadol, Ambien, Clonazepam (Klonopin), Cyclobenzaprine (Flexeril), Hydrocodone, anastrozole, and testosterone injections but they did not impose any restrictions related to drowsiness. *Id*. at 132-34, 138-41, 147-49, 156-58, 1230. Finally, the ALJ determined that Dr. Edelberg's opinion had "limited weight" and therefore, she was not required to adopt the limitations contained in his opinion. *Id*. at 1228-29.

Martin contends that the ALJ did not explain how a restriction to simple work without a production rate pace amply accommodates his drowsiness due to narcotic pain medication. The Court disagrees as drowsiness can decrease concentration and reflex time. Indeed, Dr. Edelberg indicated that Martin's pain and fatigue were frequently severe enough to interfere with the

attention and concentration needed to perform even simple work tasks. (R. 1761). The Court finds that the ALJ adequately explained that medical record did not reflect significant reported side-effects from prescribed medications but possible daytime drowsiness could interfere with Martin's ability to concentrate on complex tasks and his pace. *White v. Colvin*, 2015 WL 1013525, at *5-6 (S.D. Ind. March 9, 2105) (holding the ALJ adequately explained her conclusion with regard to fatigue and drowsiness where she noted there was no evidence of significantly limiting side effects from medication but nonetheless, restricted the claimant from listed work hazards to allow for any drowsiness and sleepiness that she might have during the day and limited her to simple, routine, repetitive tasks and precluded any fast-past production requirements.). For these reasons, substantial evidence supports the ALJ's consideration of Martin's drowsiness caused by medication and finding that some degree of drowsiness and lack of concentration due to medications are accommodated by mental limitations in task complexity and rate production.

### 4.      Lifting Ability

Turning to Martin's final challenge, he argues that the ALJ failed to adequately account for his limited lifting abilities. The ALJ limited Martin to light work and did not impose any additional lifting restrictions in the RFC. Light work involves lifting no more than 20 pounds at a time and frequently lifting and carrying up to 10 pounds. 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *5 (1983). Martin cites his testimony that during periods of pain, he could not open a jar and pouring a glass of milk was difficult. (R. 741). He maintains that the RFC is deficient because the VE testified that the office helper job would not be available if he was limited to sporadic lifting. *Id.* at 1337, 1340.

Substantial evidence supports the ALJ's conclusion that Martin can perform the lifting requirements of light work. Specifically, the ALJ noted Dr. Mahesh Shah's physical consultative

28

examination report in January 2013 that on musculoskeletal examination, Martin had no swelling or deformities of any of the joints, there was no trigger point tenderness, full range of motion was noted in all the joints of the upper and lower extremities, his handgrip and finger grasps and fine and gross manipulations were normal, his sensations were normal, and he had five-out-of-five motor strength in both upper and lower extremities. (R. 567, 1226). The ALJ also cited to Dr. Thomas Oryszczak's physical consultative examination report in April 2013. Dr. Oryszczak's physical examination of the upper and lower extremities indicated: no evidence of deformity, redness, warmth, thickening, or effusion of any joint; no limitation of passive or active range of any joint; fist and grip strength was five-out-of-five bilaterally, no difficulty in performing fine manipulations with either hand; muscle strength was five-out-of-five in all extremities; and no cyanosis, edema or clubbing. *Id.* at 572, 1226. Moreover, the state agency reviewing consultants concluded that Martin's physical condition was non-severe, causing no functional limitations. Finally, the ALJ specifically addressed and rejected Dr. Edelberg's opinion that Martin is unable to reliably and repetitively lift and carry any amount of weight in a competitive work situation and could use his hands only 10 percent of an eight-hour work day as inconsistent with his own records which did not recommend any treatment other than the drugs he prescribed. *Id.* at 1229, 1763-64. Again, Martin does not challenge the ALJ's weighing of Dr. Edelberg's opinion.

Beyond this, there is no merit to Martin's claim that the ALJ erred by not including a limitation to sporadic lifting in the RFC because she posed a hypothetical to the VE involving such a limitation. "[T]he Seventh Circuit has stated that, when an ALJ omits from the RFC a limitation that was presented in a hypothetical to the VE, there is no error if they hypothetical posed a more restrictive limitation than what was supported by the record." *Jolene C. v. Saul*, 2021 WL 2156426, at *6 (N.D. Ill. May 27, 2021). "Relatedly, courts in this circuit find that, if an ALJ ultimately

determines that a hypothetical posed to a VE does not accurately reflect the plaintiff's limitations, the ALJ is not required to discuss the testimony or explain the reasoning for rejecting it." *Id.* (citing cases); *see also Latowski v. Barnhart*, 93 F. App'x 963, 974 (7th Cir. 2004) ("[T]he ALJ committed no error in declining to analyze the vocational expert's response to the second, more restrictive hypothetical because that hypothetical was based on limitations the ALJ justifiably rejected."). As discussed above, only Dr. Edelberg opined that a lifting restriction was necessary, and the ALJ concluded that his proposed lifting limitations were not supported by the record. Therefore, the ALJ did not err in declining to incorporate a sporadic lifting limitation in the RFC.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request for reversal and remand [11] is denied, the Acting Commissioner's motion for summary judgment [16] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated:  December 12, 2023

_____
Sunil R. Harjani
United States Magistrate Judge